**FILED UNDER SEAL**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | **Case No.** |
| | **Related to: 12-md-02311; 2:16-cv-03502** |
| IN RE INTERIOR TRIM PRODUCTS | **CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| THIS DOCUMENT RELATES TO: | **JURY TRIAL DEMANDED** |
| AUTOMOBILE DEALERSHIP ACTION | **Filed Under Seal Pursuant to Hawaii Revised Statute 480-13.3(a)(1)** |

Plaintiffs Landers Auto Group No. 1, Inc. d/b/a Landers Toyota ("Plaintiff Landers"); Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan"); V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."); Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"); Panama City Automotive Group, Inc. d/b/a John Lee Nissan ("Plaintiff John Lee"); McGrath Automotive Group, Inc. ("Plaintiff McGrath"); Green Team of Clay Center Inc. ("Plaintiff Green Team"); Lee Auto Malls-Topsham, Inc. d/b/a Lee Toyota of Topsham ("Plaintiff Topsham"); Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda"); Commonwealth Volkswagen, Inc. d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth Volkswagen"); Hodges Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff Hodges"); Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou"); Superstore Automotive, Inc. ("Plaintiff Superstore"); Cannon Nissan of Jackson, LLC ("Plaintiff Cannon Nissan"); Hammett Motor Company, Inc. ("Plaintiff Hammett"); John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"); Ancona Enterprise, Inc. d/b/a Frank Ancona Honda ("Plaintiff Ancona"); Landers McLarty Lee's Summit MO, LLC d/b/a Lee's Summit Chrysler Dodge Jeep Ram and d/b/a Lee's Summit Nissan ("Plaintiff Lee's Summit"); Archer-Perdue, Inc. d/b/a/ Archer-Perdue Suzuki

("Plaintiff Archer-Perdue"); Table Rock Automotive, Inc. d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"); Bill Pearce Honda ("Plaintiff Pearce"); Reno Dodge Sales, Inc. d/b/a Don Weir's Reno Dodge ("Plaintiff Don Weir"); Pitre, Inc. d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"); Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley"); Westfield Dodge City, Inc. ("Plaintiff Westfield"); John Greene Chrysler Dodge Jeep, LLC ("Plaintiff John Greene"); Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet ("Plaintiff Champion"); Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"); Capitol Dealerships, Inc. d/b/a Capitol Toyota ("Plaintiff Capitol Toyota"); Landers McLarty Fayetteville TN, LLC ("Plaintiff Fayetteville"); Central Salt Lake Valley GMC Enterprises, LLC d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"); Stranger Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade"); Apex Motor Corporation ("Plaintiff Apex"); Shearer Automotive Enterprises III, Inc. ("Plaintiff Shearer"); Ramey Motors, Inc. ("Plaintiff Ramey"); Thornhill Superstore, Inc. d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"); Dave Heather Corporation d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland" and collectively "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection, and unjust enrichment laws. Plaintiffs demand a jury trial and allege as follows:

## NATURE OF ACTION

1.      This lawsuit is brought as a proposed class action against INOAC Corporation, INOAC Group North America, LLC, and INOAC USA Inc. (collectively "INOAC" or "Defendants") and unnamed co-conspirators, manufacturers and/or suppliers of automotive plastic

interior trim parts ("Interior Trim") (defined below) globally and in the United States, for engaging in a long-running conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for Interior Trim. According to the United States Department of Justice ("DOJ"), Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and automobile dealers alike.

2.      Plaintiffs seek to represent all automobile dealers that, during the period from and including June 2004 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class Period"), purchased a new four-wheeled passenger automobile, van, sports utility vehicle, crossover, or pickup truck for resale ("Vehicle") in the United States which included one or more Interior Trim(s) as a component part which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant or any co-conspirator of Defendants.

3.      "Interior Trim(s)" are automotive plastic interior trim parts. They do not include the main bodies of instrument panels and typically consist of molded trim parts made from plastics, polymers, elastomers and/or resins manufactured and/or sold for installation in automobile interiors, including, without limitation, console boxes, assist grips, registers, center cluster panels, glove boxes and glove box doors, meter cluster hoods, switch hole covers, and lower panel covers and boxes.

4.      Defendants manufacture, market, and/or sell Interior Trim throughout and into the United States. Defendants and their co-conspirators agreed, combined, and conspired to fix, raise, maintain and/or stabilize prices, rig bids, and allocate the market and customers in the United States for Interior Trim.

3

FILED UNDER SEAL

5.     The DOJ's Antitrust Division is currently conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry. As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry.

6.     The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct. The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded, to date, nearly $3 billion in criminal fines. The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several automotive parts manufacturers.

7.     On November 19, 2015, the FBI announced that INOAC Corp. had agreed to pay a $2.35 million criminal fine and plead guilty to a criminal Information charging it with participating in a combination and conspiracy to suppress and eliminate competition by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain plastic interior trim automotive parts sold to an automobile manufacturer in the United States for installation in Vehicles manufactured and sold in the United States and elsewhere beginning at least as early as June 2004 and continuing until at least September 2012.  The combination and conspiracy engaged in by INOAC was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.     Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the

FILED UNDER SEAL

supply of, rig bids for, and to fix, stabilize, and maintain the prices of Interior Trim sold to Vehicle manufacturers and others in the United States. The combination and conspiracy engaged in by Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection, and unjust enrichment laws.

9.     As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Classes (as defined below) paid artificially inflated prices for Interior Trim during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants.

12.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise

to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found in or transact business in this District.

13.     This Court has *in personam* jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including, as alleged by the DOJ, in this District; (b) directly or indirectly sold or marketed substantial quantities of Interior Trim throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including, as alleged by the DOJ, in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including, as alleged by the DOJ, in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

14.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

15.     The activities of Defendants were within the flow of, were intended to have, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

16.     Interior Trim manufactured abroad by Defendants and sold for use in Vehicles in the United States are goods brought into the United States for sale, and therefore constitute import

commerce. To the extent any Interior Trim are purchased in the United States, and such Interior Trim do not constitute import commerce, the Defendants' activities during the Class Period with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

17. By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Interior Trim, which conspiracy unreasonably restrained trade and adversely affected the market for Interior Trim.

18. Defendants' conspiracy and wrongdoing described herein adversely affected automobile dealers in the United States that purchased a new Vehicle in the United States which included one or more Interior Trim.

19. Interior Trim manufactured abroad by Defendants and sold for use in Vehicles in the United States are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any Interior Trim are purchased in the United States, and such Interior Trim do not constitute import commerce, Defendants' activities with respect thereto, as more fully alleged herein during the Class Period, had, and continues to have, a direct, substantial, and reasonably foreseeable effect on United States Commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

## PARTIES

### Plaintiffs

20.      Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas. Plaintiff Landers is an authorized Toyota, Scion dealer who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Landers purchased and received the aforementioned Vehicles in Arkansas.

21.      Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California. Plaintiff Empire Nissan is an authorized Nissan dealer who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Empire Nissan purchased and received the aforementioned Vehicles in California.

22.      Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California. Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff V.I.P. purchased and received the aforementioned Vehicles in California.

23.      Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida. Plaintiff Lee is presently an authorized Nissan dealer. During the Class Period, Plaintiff Lee was an authorized Nissan, GMC, Pontiac, Oldsmobile, and Jeep dealer who bought Vehicles containing Interior Trim manufactured by Defendants or their co-conspirators. Plaintiff Lee purchased and received the aforementioned Vehicles in Florida.

24.     Plaintiff John Lee is a Florida corporation with its principal place of business in Panama City, Florida. During the Class Period, Plaintiff John Lee was an authorized Nissan dealer that purchased Vehicles containing Interior Trim manufactured by the Defendants or their co-conspirators.  Plaintiff John Lee purchased and received the aforementioned Vehicles in Florida.

25.     Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa. Plaintiff McGrath is an authorized Buick, Cadillac, Chevrolet, GMC, Pontiac, Chrysler, Jeep, Dodge, RAM, Kia, Mazda, and Volkswagen dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff McGrath purchased and received the aforementioned Vehicles in Iowa.

26.     Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas. Plaintiff Green Team is an authorized Jeep, Dodge, and Ram dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Green Team purchased and received the aforementioned Vehicles in Kansas.

27.     Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine. Plaintiff Topsham is an authorized Toyota and Scion dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Topsham purchased and received the aforementioned Vehicles in Maine.

28.     Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine. Plaintiff Lee Honda is an authorized Honda, Oldsmobile, Cadillac, and GMC dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Lee Honda purchased and received the aforementioned Vehicles in Maine.

9

FILED UNDER SEAL

29.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who bought Volkswagen-brand Vehicles containing Interior Trim manufactured by one or more of the Defendants or their co-conspirators during the Class Period.  Plaintiff Commonwealth Volkswagen purchased and received the aforementioned Vehicles in Massachusetts.

30.     Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Hodges purchased and received the aforementioned Vehicles in Michigan.

31.     Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan. Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Patsy Lou purchased and received the aforementioned Vehicles in Michigan.

32.     Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota. Plaintiff Superstore is currently an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore. During the Class Period, Plaintiff Superstore was an authorized Buick, Pontiac, GMC, and Hyundai dealer who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators. Plaintiff Superstore purchased and received the aforementioned Vehicles in Minnesota.

33.     Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi. Plaintiff Cannon Nissan is an authorized Nissan dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-

FILED UNDER SEAL

conspirators during the Class Period. Plaintiff Cannon Nissan purchased and received the aforementioned Vehicles in Mississippi.

34.    Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi. Plaintiff Hammett is currently an authorized Ford dealer. During the Class Period, Plaintiff Hammett was an authorized Ford and Mercury dealer who bought Vehicles containing Interior Trim manufactured by one or more Defendants and/or their co-conspirators. Plaintiff Hammett purchased and received the aforementioned Vehicles in Mississippi.

35.    Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Johnson purchased and received the aforementioned Vehicles in Mississippi.

36.    Plaintiff Ancona is a Missouri corporation, with its principal place of business in Oalthe, Kansas during the Class Period. Plaintiff Ancona was an authorized Honda dealer during the Class Period, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Ancona purchased and received the aforementioned Vehicles in Kansas.

37.    Plaintiff Lee's Summit is a Missouri corporation with its principal place of business in Lee's Summit, Missouri. Plaintiff Lee's Summit is an authorized Chrysler, Dodge, Jeep, RAM dealer, and a Nissan dealer, who bought Vehicles containing Interior Trim manufactured by Defendants or their co-conspirators during the Class Period.  Plaintiff Lee's Summit purchased and received the aforementioned Vehicles in Missouri.

11

FILED UNDER SEAL

38.     Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska. Plaintiff Archer-Perdue is an authorized Suzuki dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Archer-Perdue purchased and received the aforementioned Vehicles in Nebraska.

39.     Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska. Plaintiff Table Rock is an authorized Hyundai dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Table Rock purchased and received the aforementioned Vehicles in Nebraska.

40.     Plaintiff Pearce is a Nevada corporation, with its principal place of business in Reno, Nevada during the Class Period. Plaintiff Pearce was an authorized Honda dealer during the Class Period, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Pearce purchased and received the aforementioned Vehicles in Nevada.

41.     Plaintiff Don Weir is a Nevada corporation with its principal place of business in Reno, Nevada. Plaintiff Weir is an authorized Chrysler, Dodge and Jeep dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period.  Plaintiff Don Weir purchased and received the aforementioned Vehicles in Nevada.

42.     Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico. Plaintiff Pitre is an authorized Buick, Hummer, Pontiac, and GMC dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their

FILED UNDER SEAL

co-conspirators during the Class Period. Plaintiff Pitre purchased and received the aforementioned Vehicles in New Mexico.

43.     Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York. During the Class Period, Plaintiff Hartley was an authorized Honda, Buick, and GM dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Hartley purchased and received the aforementioned Vehicles in New York.

44.     Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York. Plaintiff Westfield is an authorized Dodge dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Westfield purchased and received the aforementioned Vehicles in New York.

45.     Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene was an authorized Chrysler, Dodge, Jeep, RAM, Plymouth, and Oldsmobile dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff John Greene purchased and received the aforementioned Vehicles in North Carolina.

46.     Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.  Plaintiff Champion is an authorized Chevrolet dealer, who bought Vehicles containing Interior Trim manufactured by one or more of the Defendants and/or their co-conspirators during the Class Period. Plaintiff Champion purchased and received both the afore-mentioned Vehicles in Nevada.

47.     Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon. Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and

FILED UNDER SEAL

Subaru dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Capitol Chevrolet purchased and received the aforementioned Vehicles in Oregon.

48.     Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon. Plaintiff Capitol Toyota is an authorized Toyota and Scion dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Capitol Toyota purchased and received the aforementioned Vehicles in Oregon.

49.     Plaintiff Fayetteville is an Arkansas corporation, with its principal place of business in Fayetteville, Tennessee. Plaintiff Fayetteville is an authorized Toyota and Scion dealer who bought Vehicles containing Interior Trim manufactured by Defendants or their co-conspirators during the Class Period.  Plaintiff Fayetteville purchased and received the aforementioned Vehicles in Tennessee.

50.     Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah. Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Salt Lake Valley purchased and received the aforementioned Vehicles in Utah.

51.     Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah. Plaintiff Wade is an authorized Toyota dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Wade purchased and received the aforementioned Vehicles in Utah.

FILED UNDER SEAL

52.     Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont. Plaintiff Apex is an authorized Acura dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Apex purchased and received the aforementioned Vehicles in Vermont.

53.     Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont. Plaintiff Shearer is an authorized Honda dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Shearer purchased and received the aforementioned Vehicles in Vermont.

54.     Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia. Plaintiff Ramey was an authorized Scion, Buick, Chevrolet, Pontiac, and Oldsmobile dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Ramey purchased and received the aforementioned Vehicles in West Virginia.

55.     Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia. Plaintiff Thornhill was an authorized Chevrolet, Buick, Pontiac, and GMC dealer, who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Thornhill purchased and received the aforementioned Vehicles in West Virginia.

56.     Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin. During the Class Period, Plaintiff Lakeland was an authorized Toyota, Scion, Honda, Mazda, and Subaru dealer who bought Vehicles containing Interior Trim manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Lakeland purchased and received the aforementioned Vehicles in Wisconsin.

FILED UNDER SEAL

## **Defendants**

57.     When Plaintiffs refer to a corporate family or companies by a single name in the Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

58.     Defendant INOAC Corporation is a Japanese corporation with its primary place of business in Nagoya, Japan. INOAC, directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Interior Trim that was sold and purchased throughout the United States, including in this District.  According to its website, INOAC was incorporated in 1954 and employs more than 1,500 people.

59.     Defendant INOAC Group North America, LLC, is a Michigan limited liability company partially owned by INOAC Corporation and located in Troy, Michigan, with offices also in Springfield, Kentucky. On information and belief, Defendant INOAC Group North America, LLC manufactured, marketed and/or sold Interior Trim that was sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

60.     Defendant INOAC USA Inc. is a Delaware corporation partially owned by INOAC Corporation and is located in Troy, Michigan, with offices also located in Florence, Kentucky. On

16

FILED UNDER SEAL

information and belief, Defendant INOAC USA Inc. manufactured, marketed and/or sold Interior Trim that was sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

**AGENTS AND CO-CONSPIRATORS**

61.   Each Defendant acted as the principal of, or agent for, the other Defendants, and unnamed co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

62.   Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants or co-conspirators in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

63.   Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

**FACTUAL ALLEGATIONS**

A.   **The Interior Trim Industry**

64.   Interior Trim(s) are molded automotive component parts that are made from plastics, polymers, elastomers, and/or resins and are used in automotive interiors, such as console boxes, assist grips, registers, center cluster panels (but not the main bodies of instrument panels),

17

FILED UNDER SEAL

glove boxes and glove box doors, meter cluster hoods, switch hole covers, and lower panel covers and boxes.

65.     Defendants manufacture and sell Interior Trim to Toyota and certain of their subsidiaries and affiliates (collectively "Automobile Manufacturers") for installation in vehicles manufactured and sold in the United States and elsewhere. One Automobile Manufacturer's United States subsidiary, located in Erlanger, Kentucky, purchased Interior Trim to be installed in the Automobile Manufacturer's vehicles.

66.     Interior Trim are installed by original equipment manufacturers ("OEMs") in Vehicles as part of the automotive manufacturing process.

67.     For Vehicles, the OEMs – mostly large automotive manufacturers such as Ford Motor Company, Toyota Motor Corporation, or General Motors Corp., *etc.* – purchase Interior Trim directly from the Defendants.  Interior Trim may also be purchased by component manufacturers who then supply the manufactured component to OEMs.  These component manufacturers are also called "Tier 1 Manufacturers" in the industry.  Tier 1 Manufacturers supply Interior Trim directly to an OEM.

68.     When purchasing Interior Trim, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model specific parts. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years. Typically, the bidding process for a particular model begins approximately a year or more prior to the start of production, and Interior Trim are developed over a year in advance of a Vehicle entering the market.  OEMs procure Interior Trim for U.S.-manufactured Vehicles in the United States and elsewhere.

69.     Defendants and their co-conspirators supplied Interior Trim to OEMs for installation in Vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Interior Trim (a) in the United States for installation in Vehicles manufactured and sold in the United States;  (b) in Canada for installation in Vehicles manufactured in Canada for export to and sale in the United States; and (c) in Japan for installation in Vehicles manufactured in Japan for export to, and sale in, the United States.

70.     Plaintiffs and members of the proposed Classes purchased Interior Trim indirectly from one or more Defendants or their co-conspirators. By way of example, an automobile dealer may indirectly purchase one or more Interior Trim(s) from Defendants or their co-conspirators as part of purchasing a Vehicle.

**B.      The Structure and Characteristics of the Interior Trim Market Render the Conspiracy More Plausible**

71.     The Interior Trim market in the United States is conducive to a price-fixing agreement, and has made collusion particularly attractive in this market because of its structure and other characteristics. Specifically, the Interior Trim market: (1) has high barriers to entry; and (2) has inelasticity of demand.

**1.      The Interior Trim Market Has High Barriers to Entry**

72.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

73.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Interior Trim market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment,

FILED UNDER SEAL

energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

74.    Defendants also own patents related to the manufacture of Interior Trim. Defendants' patents place a significant and costly burden on potential new entrants, who must avoid infringing on those patents when entering the market with a new product.

75.    In addition, OEMs cannot change Interior Trim suppliers randomly after a supplier is initially selected because the OEMs design the features of their Vehicles so that the Interior Trim they purchase for a Vehicle are then integrated with the other components of the particular Vehicle model. Thus, manufacturers and OEMs must agree on a design that is unique to a particular Vehicle model. It would be difficult for a new market entrant to do so.

### 2.    There is Inelasticity of Demand for Interior Trim

76.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

77.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

78.    Demand for Interior Trim is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase Interior Trim as an essential part of a Vehicle, even if the prices are kept at a supracompetitive level.

### C.      Government Investigations

79.      A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada and Japan, aimed at suppliers of automotive parts in general, and Interior Trim in particular. A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that the international automotive parts supplier investigation would continue to widen because the automotive industry as a whole comprises many sub-industries. He characterized the investigation being conducted by international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

80.      The antitrust probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC"). The EC and the FBI have executed surprise raids at the European and U.S. offices of several automotive parts manufacturers, including certain Defendants, as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

81.      On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts. The DOJ has confirmed that its automotive parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct. To date, as a result of its widespread investigation, the DOJ has charged more than 100 individuals and companies with criminal antitrust violations and the DOJ has levied nearly $3 billion in criminal fines against various automotive parts manufacturers.

### D.      INOAC Pleads Guilty to Price Fixing Conspiracy

82.      On November 19, 2015, the DOJ announced that INOAC Corp. had agreed to plead guilty and to pay a $2.35 million criminal fine for its role in a conspiracy to fix prices and rig bids

FILED UNDER SEAL

on certain plastic interior trim automotive parts installed in cars sold in the U.S. The information stated that INOAC Corp., together with other co-conspirators, participated in a conspiracy to suppress and eliminate competition in the automotive parts industry, in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). The conspiracy lasted from approximately June 2004 through at least September 2012.

83.    The information states that INOAC is a corporation organized and existing under the laws of Japan, with its principal place of business in Nagoya, Japan, and with subsidiaries, affiliates, or joint ventures in various locations in the United States.

84.    The information states that during the relevant period, the Defendants and their co-conspirators manufactured certain plastic interior trim automotive parts: (a) in the United States for installation in vehicles manufactured and sold in the United States; (b) in Canada for installation in vehicles manufactured in Canada for export to and sale in the United States; and (c) in Japan for installation in vehicles manufactured in Japan for export to, and sale in, the United States.

85.    The information states that the combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among INOAC Corp. and its co-conspirators, the substantial terms of which were to allocate sales of, to rig bids for, and to fix, stabilize, and maintain prices of automotive Interior Trim products sold to an automobile manufacturer Toyota in the United States and elsewhere.

86.    According to the information, INOAC Corp. and its co-conspirators carried out the Interior Trim conspiracy by:

FILED UNDER SEAL

(a)    participating in meetings, conversations, and other communications to discuss the bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, to allocate among the companies sales of certain plastic interior trim automotive parts sold to an automobile manufacturer in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

(d)    exchanging information on bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere, in order to effectuate the agreements;

(e)    submitting bids and price quotations to an automobile manufacturer in the United States and elsewhere in accordance with the agreements;

(f)    selling certain plastic interior trim automotive parts to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices; and

(g)    accepting payment for certain Plastic Interior Trim Automotive Parts sold to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices.

87.    The information further states that INOAC Corp. and its co-conspirators restricted trade and commerce because they sold to an automobile manufacturer in the United States and elsewhere substantial quantities of Interior Trim, all in a continuous and uninterrupted flow of

FILED UNDER SEAL

interstate commerce.  In addition, the information states that substantial quantities of equipment and supplies necessary to the production and distribution of Interior Trim by INOAC Corp. and its co-conspirators, as well as payments for such parts, traveled in interstate commerce. The business activities of INOAC Corp. and its co-coconspirators in connection with the production and sale of certain Interior Trim were within the flow of, and substantially affected, interstate commerce.

88.     Finally, the information states that all of INOAC Corp. and its co-conspirators' actions as charged are in violation of 15 U.S.C. § 1.

### D.    Likely Existence of a Cooperating Defendant

89.     The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the DOJ. In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

90.     In light of the guilty plea in this case, multiple guilty pleas in related automotive parts antitrust cases, and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

FILED UNDER SEAL

E.     **Additional Criminal Pleadings in the Automotive Parts Industry**

91.     On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. agreed to plead guilty and pay a $200 million criminal fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of automotive wire harnesses and related products to automobile manufacturers.

92.     In the press release announcing the fine against Furukawa Electric Co. Ltd., Sharis A. Pozen, then the Acting Assistant Attorney General in charge of the DOJ's Antitrust Division, said that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars." Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped." The press release also quoted FBI's Special Agent in Charge Andrew G. Arena, who said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," and that "[t]he FBI is committed to aggressively pursuing any company involved in antitrust crimes."

93.     On January 30, 2012, the DOJ announced that Yazaki Corporation agreed to plead guilty and pay a $470 million criminal fine and DENSO Corporation agreed to plead guilty and pay a $78 million criminal fine for their respective involvement in multiple price-fixing and bid-rigging conspiracies in the sale of automotive parts to automobile manufacturers in the United States. According to the three-count criminal Information filed against Yazaki, it engaged in three separate conspiracies: (i) to rig bids for and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to certain automobile manufacturers in the United States and elsewhere; (ii) to rig bids for and to fix, stabilize, and maintain the prices of, instrument panel clusters ("IPCs") sold to certain automobile manufacturers in the United States and elsewhere; and

FILED UNDER SEAL

(iii) to fix, stabilize, and maintain the prices of fuel senders sold to an automobile manufacturer in the United States and elsewhere. According to the two-count felony charge against DENSO Corporation, it engaged in conspiracies to rig bids for, and to fix, stabilize, and maintain the prices of, electronic control units ("ECUs") and heater control panels ("HCPs") sold to an automobile manufacturer in the United States and elsewhere.

94.     In the press release announcing the fines against Yazaki Corporation, its executives, and DENSO Corporation, Special Agent in Charge Andrew G. Arena said that "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade. The conduct has also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"

95.     On April 3, 2012, the DOJ announced that G.S. Electech Inc. agreed to plead guilty and pay a $2.75 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, speed sensor wire assemblies used on antilock brake systems sold to an automobile manufacturer in the United States and elsewhere.

96.     On April 23, 2012, the DOJ announced that Fujikura Ltd. agreed to plead guilty and pay a $20 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere.

97.     On June 6, 2012, the DOJ announced that Autoliv Inc. agreed to plead guilty to a two-count criminal Information and pay a $14.5 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by (i) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts sold to a

FILED UNDER SEAL

Japanese automobile manufacturer; and (ii) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts, airbags, and/or steering wheels sold to a Japanese automobile manufacturer.

98.    On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH agreed to plead guilty and pay a $5.1 million criminal fine for its involvement in a combination and conspiracy, through its employees, including high level employees of its wholly-owned subsidiaries, to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts, airbags and steering wheels sold to two German automobile manufacturers in the United States and elsewhere.

99.    On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. agreed to plead guilty and pay a $1 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, IPCs sold to an automobile manufacturer in the United States and elsewhere.

100.    On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. agreed to plead guilty and pay a $17.7 million criminal fine for its involvement in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs sold to an automobile manufacturer in the United States and elsewhere. Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

101.    On February 15, 2013, Scott Hammond, the then Deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article. He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest

criminal antitrust investigation that we've ever encountered. *I say the biggest with respect to the impact on U.S. businesses and consumers, and the number of companies and executives that are subject to the investigation."* (emphasis added).

102.    On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. agreed to plead guilty and pay a $19 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, ignition coils sold to automobile manufacturers in the United States and elsewhere.

103.    In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said "[t]hose who engage in price fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

104.    On July 18, 2013, Panasonic Corporation agreed to plead guilty and pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of various automotive parts including high intensity discharge ("HID") ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.

105.    On September 26, 2013, nine additional Japanese automotive suppliers agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than 30 different automotive products:

a)    Hitachi Automotive Systems Ltd. agreed to plead guilty and pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of automotive parts, including, among others, air

FILED UNDER SEAL

flow meters, fuel injection systems, electronic throttle bodies, and inverters sold to automobile manufacturers in the United States and elsewhere;

b)     Mitsuba Corporation agreed to plead guilty and pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere. Mitsuba Corporation's plea agreement defined "automotive parts" to include windshield wiper systems, windshield washer systems, starter motors, power window motors, fan motors, radiator fans, door mirrors, lamps, power seat motors, sunroof, door and tailgate motors, electric power steering motors, electronic throttle motors, horns, automotive electric relays and switches, automotive electric actuators, AC generators, and fuel pumps. Mitsuba also agreed to plead guilty to one count of obstruction of justice because of the company's efforts to destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the automotive parts industry;

c)     Mitsubishi Electric Corporation agreed to plead guilty and pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere. For purposes of Mitsubishi Electric Corporation's plea agreement, "automotive parts" were defined to include AC generators, air bag sensors, electronic control units, exhaust gas recirculation valves, fuel injectors, fuel pumps, HID ballasts, ignition coils, integrated units, keyless entry systems, MAP sensors, purge control valves, starter motors, throttle bodies, variable cam timing, and variable valve timing;

29

FILED UNDER SEAL

d)      Mitsubishi Heavy Industries Ltd. agreed to plead guilty and pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of compressors and condensers sold to automobile manufacturers in the United States and elsewhere;

e)      T.RAD Co. Ltd. agreed to plead guilty and pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of radiators and automatic transmission fluid warmers ("ATF warmers") sold to automobile manufacturers in the United States and elsewhere;

f)      Valeo Japan Co. Ltd. agreed to plead guilty and pay a $13.6 million criminal fine for its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the prices of air conditioning systems sold to automobile manufacturers in the United States and elsewhere;

g)      JTEKT Corporation agreed to plead guilty and pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered steering assemblies sold to automobile manufacturers in the United States and elsewhere;

h)      NSK Ltd. agreed to plead guilty and pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings sold to an automobile manufacturer in the United States and elsewhere; and

i)      Yamashita Rubber Co. Ltd. agreed to plead guilty and pay an $11 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, raise and

FILED UNDER SEAL

maintain the prices of automotive anti-vibration rubber products sold in the United States and elsewhere to automobile manufacturers.

106.    On the same day, September 26, 2013, then United States Attorney General Eric Holder presented the DOJ's most recent findings in the ongoing automotive parts investigation. Then Attorney General Holder also described how the conspiracies worked: "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. In order to keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."   Then attorney Attorney General Holder explained that the automotive parts conspiracies "Targeted U.S. manufacturing, U.S. businesses, and U.S. consumers.  As a result of these conspiracies, Americans paid more for their cars. . . ."

107.    The diagram below, which was prepared by the DOJ, illustrates the September 26, 2013 guilty pleas and the corresponding automotive parts to which the various manufacturers have admitted price-fixing.

**FILED UNDER SEAL**



108.    On October 9, 2013, Takata Corporation announced that it agreed to pay $71.3 million to settle antitrust charges brought by the United States federal prosecutors for its role in a conspiracy to price-fix seatbelts.

109.    On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. agreed to plead guilty and pay a $120 million criminal fine for its role in two separate conspiracies. Toyo Tire & Rubber Co. Ltd. engaged in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of automotive anti-vibration rubber products sold to automobile manufacturers in the United States and elsewhere, and by agreeing to allocate sales of, and to fix, raise, and maintain the prices of, automotive constant-velocity-joint boot products sold to GKN plc and its subsidiaries in the United States and elsewhere.

110.    On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. agreed to plead guilty and pay a $1.44 million criminal fine for its participation in a conspiracy to fix

FILED UNDER SEAL

prices of automotive HID lamp ballasts installed in automobiles sold in the United States and elsewhere.

111.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co. Ltd. agreed to plead guilty and pay a $56.6 million criminal fine for its roles in separate price-fixing conspiracies involving automobile lighting fixtures and automotive HID lamp ballasts installed in cars sold in the United States and elsewhere.

112.    On February 3, 2014, the DOJ announced that Aisan Industry Co. Ltd. agreed to plead guilty and pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to an automobile manufacturer in the United States and elsewhere.

113.    On February 13, 2014, the DOJ announced that Bridgestone Corp. agreed to plead guilty and pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.

114.    On April 23, 2014, the DOJ announced that Showa Corp. agreed to plead guilty and pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in cars sold in the United States and elsewhere.

115.    On August 19, 2014, the DOJ announced that NGK Sparkplug Co. Ltd. agreed to plead guilty and pay a $52.1 million criminal fine for its role in a conspiracy to fix prices of, and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors installed in cars sold to automobile manufacturers in the United States and elsewhere.

116.    On September 29, 2014, the DOJ announced that Toyoda Gosei Co. Ltd. agreed to plead guilty and pay a $26 million criminal fine for its role in the combination and conspiracy to suppress competition in the automotive parts industry by agreeing to allocate sales of, to rig bids

FILED UNDER SEAL

for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold to an automobile manufacturer in the United States, as well as agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels sold to automobile manufacturers in the United States and elsewhere.

117.    On October 31, 2014, the DOJ announced that Hitachi Metals Ltd. agreed to plead guilty and pay a $1.25 million criminal fine for its role in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, rig bids for, and to fix, raise, and maintain the prices of automotive brake hoses installed in automobiles sold to an automobile manufacturer in the United States and elsewhere.

118.    On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. agreed to plead guilty and pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices installed in cars sold to automobile manufacturers in the United States and elsewhere.

119.    On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. agreed to plead guilty and pay a criminal fine of $4 million for their roles in a conspiracy to rig bids of IPCs installed in Vehicles manufactured and sold in the United States.

120.    On January 27, 2015, the DOJ announced that Sanden Corp. agreed to plead guilty and pay a $3.2 million criminal fine for its participation in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to fix, stabilize, and maintain the prices of compressors sold to automobile manufacturers in the United States and elsewhere.

FILED UNDER SEAL

121.    On March 31, 2015, the DOJ announced that Robert Bosch GmbH agreed to plead guilty and pay a $57.8 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, oxygen sensors and starter motors sold to automobile and internal combustion engine manufacturers in the United States and elsewhere.

122.    On April 28, 2015, the DOJ announced that Yamada Manufacturing Co., Ltd. agreed to plead guilty and pay a $2.5 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of steering columns sold to certain subsidiaries of an automobile manufacturer in the United States and elsewhere, from at least as early as the Fall of 2007 and continuing until as late as September 2012, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

123.    On September 3, 2015, the DOJ announced that NGK Insulators Ltd. agreed to plead guilty and pay a $65.3 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of ceramic substrates for automotive catalytic converters supplied to automobile manufacturers in the United States and elsewhere.  The company also agreed to plead guilty to obstruction of justice for altering, destroying or concealing documents with the intent to impede the criminal antitrust investigation.

124.    On September 16, 2015, the DOJ announced that Kayaba Industries Co., Ltd. d/b/a KYB Corporation agreed to plead guilty and pay a $62 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate markets, rig bids for, and to fix, stabilize, and maintain the prices of shock absorbers sold to certain automobile and motorcycle manufacturers in the United States and elsewhere.

FILED UNDER SEAL

125.    On March 17, 2016, the DOJ announced that Omron Automotive Electronics Co., Ltd. agreed to plead guilty and pay a $4.55 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of power window switches sold to an automobile manufacturer in the United States and elsewhere.

126.    On May 16, 2016, the DOJ announced that Corning International Kabushiki Kaisha agreed to plead guilty and pay a $66.5 million criminal fine for conspiring to fix prices, rig bids, and allocate the market for ceramic substrates sold in the United States and elsewhere, and used in catalytic converters supplied to automobile manufacturers in the United States and elsewhere.

127.    On June 15, 2016, the DOJ announced that a federal grand jury, sitting in the U.S. District Court for the Southern District of Ohio, returned an indictment charging Japanese automotive parts companies, and their U.S. subsidiaries, and a total of five executives with criminal antitrust violations for their participation in international conspiracies to eliminate competition in the sale of automotive parts in the United States.  The indictment charges Tokai Kogyo Co. Ltd., its wholly-owned U.S. subsidiary, Green Tokai Co. Ltd., and its former executive Akitada Tazumi with conspiring to rig bids for and fix the prices of automotive body sealing products sold to an automobile manufacturer for installation in vehicles sold in the United States and elsewhere.

128.    The June 15, 2016 indictment also charges Maruyasu Industries Co. Ltd., its wholly-owned U.S. subsidiary, Curtis-Maruyasu America Inc., and their executives, Tadao Hirade, Satoru Murai, Kazunori Kobayashi and Yoshihiro Shigematsu, with conspiring to fix prices, allocate customers, and rig bids for Automotive Steel Tubes sold to automobile manufacturers for installation in vehicles sold in the United States and elsewhere.

FILED UNDER SEAL

129.    On July 20, 2016, the DOJ announced that Nishikawa Rubber Co. Ltd. agreed to plead guilty and pay a $130 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of automotive body sealing products sold to automobile manufacturers in the United States and elsewhere.

130.    On August 9, 2016, the DOJ announced that Hitachi Automotive Systems Ltd. agreed to plead guilty and pay an additional criminal fine of $55.48 million for its participation in a conspiracy to allocate markets, fix prices and rig bids for shock absorbers sold to vehicle manufacturers in the United States and elsewhere from the mid-1990s until Summer 2011. According to the press release, although Hitachi Automotive Systems Ltd. previously agreed to plead guilty to price-fixing and bid-rigging various automotive parts, it failed to uncover and disclose that it had also conspired to fix the prices of shock absorbers.

131.    On September 15, 2016, the DOJ announced that Alpha Corporation agreed to plead guilty and pay a $9 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of automotive access mechanisms sold to automobile manufacturers in the United States and elsewhere.

132.    On November 8, 2016, the DOJ announced that Usui Kokusai Sangyo Kaisha Ltd. agreed to plead guilty and pay a $7.2 million criminal fine for its participation in the conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of automotive steel tubes sold to automobile manufacturers in the United States and elsewhere.

FILED UNDER SEAL

133.    On March 7, 2017, the DOJ announced that Kiekert AG agreed to plead guilty and to pay a $6.1 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of side-door latches and latch minimodules sold to automobile manufacturers in the United States and elsewhere.

134.    To date, 48 companies and 65 executives have been charged in the Antitrust Division's ongoing investigation into price-fixing and bid-rigging in the automotive parts industry. Of the 48 companies charged, 44 have either pleaded guilty or agreed to plead guilty and, altogether, they have agreed to pay nearly $3 billion in criminal fines.

135.    "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI Special Agent in Charge Andrew G. Arena.  "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system." Arena said.  "The FBI is committed to aggressively pursuing any company involved in antitrust crimes," Arena also said.

## CLASS ACTION ALLEGATIONS

136.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that, during the Class Period, (a) purchased a Vehicle for resale in the United States that included Interior Trim as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant, or (b) indirectly purchased Interior Trim, which were manufactured or sold by a Defendant, any current

FILED UNDER SEAL

or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

137.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and antitrust, unfair competition, and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, as well as the unjust enrichment laws of Missouri, Massachusetts, and Illinois. The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, and Illinois, are collectively referred to as the "Indirect Purchaser States." These claims are brought by Plaintiffs on behalf of themselves and entities in the Indirect Purchaser States listed in the Second, Third and Fourth Claims as follows on behalf of the following class (the "Damages Class"):

> All automobile dealers, in the Indirect Purchaser States, that, during the Class Period, (a) purchased a Vehicle for resale in the United States that included Interior Trim as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant, or (b) indirectly purchased Interior Trim , which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

138.    The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons or entities who purchased Interior Trim directly, and persons or entities in the End-Payor Class, as defined in the End-Payor complaint.

139.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) hundreds of members in each Class.

FILED UNDER SEAL

140.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Interior Trim sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Antitrust Act, as alleged in the First Claim for Relief;

(e)    Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws, as alleged in the Second and Third Claims for Relief;

(f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injuries to the business or property of Plaintiffs and the members of the Classes;

FILED UNDER SEAL

(h)     The effect of the alleged conspiracy on the prices of Interior Trim sold in the United States during the Class Period;

(i)     Whether automobile dealers purchasing Vehicles containing Interior Trim have been deprived of free and open competition;

(j)     Whether Plaintiffs and members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(k)     Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

(l)     The appropriate injunctive and related equitable relief for the Nationwide Class; and,

(m)     The appropriate class-wide measure of damages for the Damages Class.

141.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Interior Trim purchased indirectly from Defendants and/or their co-conspirators.

142.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

143.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

FILED UNDER SEAL

144.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

145.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

146.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated for Interior Trim;

(b)    The prices of Interior Trim have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Indirect purchasers of Interior Trim have been deprived of free and open competition; and

(d)    Indirect purchasers of Interior Trim paid artificially inflated prices.

147.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Interior Trim as a result of Defendants' conspiracy. Automobile dealers ultimately bore the inflated prices. Those overcharges have unjustly enriched Defendants.

148.    The markets for Interior Trim and Vehicles are inextricably linked and intertwined because the market for Interior Trim exists to serve the Vehicles market. Without the Vehicles, the

FILED UNDER SEAL

Interior Trim have little to no value because they have no independent utility. Indeed, the demand for Vehicles creates the demand for Interior Trim. As stated in the 2010 Annual Report of Lear Corp., an automotive parts supplier: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

149.    Interior Trim are identifiable, discrete physical products that remain essentially unchanged when incorporated into a Vehicle. As a result, Interior Trim follow a traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes, and cost changes attributable to Interior Trim can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

150.    Just as Interior Trim can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Interior Trim affect prices paid by indirect purchasers of Vehicles containing Interior Trim.

151.    Hence, the inflated prices of Interior Trim in Vehicles resulting from the Defendants' and their co-conspirators' bid-rigging and price-fixing conspiracy have ultimately been borne by Plaintiffs and other class members.

152.    The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of Interior Trim and, as a direct and foreseeable result, the price of Vehicles containing Interior Trim. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact

FILED UNDER SEAL

of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Interior Trim on prices for Vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Interior Trim affects changes in the price of Vehicles. In such models, the price of Interior Trim would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Interior Trim impact the price of Vehicles containing Interior Trim while controlling for the impact of other price-determining factors.

153.    The precise amount of the overcharge impacting the prices of Vehicles containing Interior Trim can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge automobile dealers bore. Thus, the economic harm to Plaintiffs and members of the Classes can be quantified.

154.    On September 26, 2013, then United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's then most recent findings in the ongoing automotive parts investigation. He stated "[t]hese international price fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers. In total, more than 25 million cars . . . were affected by the illegal conduct." Then Attorney General Holder also described how the conspiracies worked: "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of automotive parts sold to U.S. car companies. In order to keep their illegal conduct secret, they used code names and met in remote locations. They followed up with each other regularly to make sure the collusive agreements were being adhered to."  Then Attorney General Holder explained

that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses, and U.S. consumers."

155.    By reason of the violations of the antitrust and consumer protection laws alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Interior Trim than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims

156.    Plaintiffs repeat and re-allege the allegations set forth above.

157.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) November 19, 2015, the date that the DOJ announced INOAC Corp.'s anticipated guilty plea.

158.    Plaintiffs and members of the Classes are automobile dealers who purchased Vehicles containing Interior Trim. They had no direct contact or interaction with Defendants and had no means from which they could have discovered the Interior Trim combination and conspiracy described in this Complaint before November 19, 2015, the date the DOJ announced the INOAC Corp.'s anticipated guilty plea.

159.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to November 19, 2015, the date the DOJ publicly announced Defendant INOAC Corp.'s anticipated guilty plea, that revealed sufficient information to suggest

FILED UNDER SEAL

that Defendants were involved in a criminal conspiracy to fix the prices of, and rig bids for Interior Trim. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of the Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

160.   For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run until, at the earliest, November 19, 2015, and was tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

### B.      Fraudulent Concealment Tolled the Statute of Limitations

161.   In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November 19, 2015, the date that the DOJ publicly announced INOAC Corp.'s anticipated guilty plea.

162.   Before that time, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct, and did not know before then that they were paying supracompetitive prices for Interior Trim throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and members of the Classes that even hinted to Plaintiffs that they were being injured by Defendants' unlawful conduct.

163.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

164.   Specifically, as then Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the Automotive parts industry, "[i]n

FILED UNDER SEAL

order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

165.    By its very nature, Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing. Interior Trim are not exempt from antitrust regulation, and thus, before November 19, 2015, Plaintiffs and members of the Classes reasonably considered the Interior Trim industry to be a competitive industry.   Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the Defendants' Interior Trim prices before November 19, 2015.

166.    Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

167.    Throughout the course of the conspiracy, Defendants met and communicated in secret in to conceal their conspiracy from the public and avoid detection thereof. Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations. The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs. The exact dates and times of these meetings are within the knowledge of Defendants,

FILED UNDER SEAL

including those Defendants who have pleaded guilty to criminal violations of the Sherman Antitrust Act, 15 U.S.C. § 1.

168.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by the Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until November 19, 2015, the date that the DOJ publicly announced Defendant INOAC Corp.'s anticipated guilty plea.

169.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until November 19, 2015.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

170.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

171.    Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1).

172.    The acts done by each of the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

173.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Interior Trim, thereby creating anticompetitive effects.

FILED UNDER SEAL

174.    The anticompetitive acts were intentionally directed at the United States market for Interior Trim and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for these products throughout the United States.

175.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Interior Trim.

176.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated automobile dealer purchasers in the Nationwide Class who purchased Interior Trim have been harmed by being forced to pay inflated, supracompetitive prices for Interior Trim.

177.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

178.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Interior Trim has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Interior Trim sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased Interior Trim indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

179.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Interior Trim purchased indirectly

FILED UNDER SEAL

from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

180.    Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Interior Trim and Vehicles containing Interior Trim.

181.    Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Interior Trim and Vehicles containing Interior Trim because they are required to purchase Vehicles and Interior Trim to continue to operate their businesses.

182.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

183.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

184.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

185.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Interior Trim in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

186.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially

FILED UNDER SEAL

supracompetitive levels the prices for Interior Trim, to rig bids for the sale of Interior Trim, and to allocate customers for Interior Trim in the United States.

187.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Interior Trim at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Interior Trim sold in the United States;

(b)    allocating customers and markets for Interior Trim in the United States in furtherance of their agreements; and

(c)    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

188.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to Interior Trim.

189.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

190.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:

(1) Interior Trim price competition was restrained, suppressed, and eliminated

51

FILED UNDER SEAL

throughout Arizona; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

191.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq*.

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Interior Trim at supracompetitive levels.

FILED UNDER SEAL

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Interior Trim.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Interior Trim; and (2) Allocating among themselves the production of Interior Trim.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of Interior Trim has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Interior Trim sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Interior Trim or Vehicles containing Interior Trim manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Interior Trim than they otherwise would have paid in the

FILED UNDER SEAL

absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

192. Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq*.

(a) Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Interior Trim or Vehicles in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Interior Trim in the District of Columbia, paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim, including in the District of Columbia.

(b) During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

FILED UNDER SEAL

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq*.

193.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Accordingly, Plaintiffs

FILED UNDER SEAL

and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq*.

194.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

195.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

FILED UNDER SEAL

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Maine; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

196.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

FILED UNDER SEAL

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

197.    Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim

(b)      During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

198.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Interior Trim or Vehicles in Mississippi, were deprived of free and open competition, including in Mississippi; and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Interior Trim or Vehicles in Mississippi paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim, including in Mississippi.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

FILED UNDER SEAL

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq*.

199.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*.

FILED UNDER SEAL

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

200.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Interior Trim or Vehicles in Nevada, were deprived of free and open competition, including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Interior Trim or Vehicles in Nevada, paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim, including in Nevada.

(b)   During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

FILED UNDER SEAL

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq*.

201.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

202.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

FILED UNDER SEAL

(a)      Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

203.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout New York; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or

FILED UNDER SEAL

purchased Interior Trim or Vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York, paid supracompetitive, artificially inflated prices for Interior Trim when they purchased, Interior Trim or Vehicles containing Interior Trim, including in New York, or purchased, including in New York, Interior Trim or Vehicles containing Interior Trim that was otherwise of lower quality than they would have been absent Defendants' and their co-conspirators' illegal acts, or were unable to purchase Interior Trim or Vehicles containing Interior Trim that they would have otherwise purchased absent the illegal conduct.

(b)      During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

204.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

FILED UNDER SEAL

(a)     Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Interior Trim or Vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Interior Trim or Vehicles in North Carolina, paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles, including in North Carolina.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq*.

205.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

206.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

207.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Interior Trim or Vehicles in South Dakota, were deprived of free and open competition, including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Vehicles or Interior Trim in South Dakota, paid supracompetitive,

FILED UNDER SEAL

artificially inflated prices for Interior Trim and Vehicles containing Interior Trim, including in South Dakota.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

208.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Interior Trim or Vehicles in Tennessee, were deprived of free and open competition, including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee, and/or purchased Interior Trim or Vehicles in Tennessee, paid supracompetitive, artificially inflated

68

FILED UNDER SEAL

prices for Interior Trim and Vehicles containing Interior Trim, including in Tennessee.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

209.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-3101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Utah; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

FILED UNDER SEAL

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

210.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*.  Plaintiffs

are entitled to relief pursuant to Vermont Stat. Ann. 9 § 2465 and any other applicable authority.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

211.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

(a)   Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia, and/or purchased Interior Trim or Vehicles in West Virginia,  were deprived of free and open competition, including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Vehicles or Interior Trim in West Virginia paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim, including in West Virginia.

(b)   During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*.

FILED UNDER SEAL

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

212.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Interior Trim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

213.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for

FILED UNDER SEAL

Interior Trim and Vehicles containing Interior Trim than they otherwise would have paid in the absence of the Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

214.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

215.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

216.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

217.    Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

218.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*.

(a)    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Interior Trim were sold,

FILED UNDER SEAL

distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)     Defendants' unlawful conduct had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Interior Trim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

FILED UNDER SEAL

219.    The Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)    During the Class Period, Defendants marketed, sold, or distributed Interior Trim in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)    During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

(c)    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)    Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Antitrust Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

FILED UNDER SEAL

(e)     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers of Interior Trim (or Vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)     Defendants' unlawful conduct had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout California; (2) Interior Trim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Interior Trim or Vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Interior Trim or Vehicles in California, paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim, including in California.

(h)     Defendants' acts and practices are unlawful, fraudulent, or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(j)     The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to

cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Interior Trim (or Vehicles containing them). Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

220.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

(a)     The Defendants' unlawful conduct had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout Florida; (2) Interior Trim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim, and (5) Reasonable purchasers in Florida were deceived into believing that they were paying competitive prices for their Vehicles and Interior Trim.

FILED UNDER SEAL

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unlawful, unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

221.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Interior Trim were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Plaintiffs were not aware of the Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by the Defendants for Interior Trim.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing Interior Trim because they were unaware of the unlawful overcharge and because they had to

purchase Interior Trim in order to be able to operate their Vehicles. Defendants'
conduct with regard to sales of Interior Trim, including their illegal conspiracy to
secretly fix the price of Interior Trim at supracompetitive levels and overcharge
automobile dealers, was substantively unconscionable because it was one-sided and
unfairly benefited Defendants at the expense of Plaintiffs and the public.
Defendants took grossly unfair advantage of Plaintiffs.

(c)     The aforementioned conduct on the part of the Defendants constituted
"unconscionable trade practices," in violation of N.M.S.A. § 57-12-3, in that such
conduct, inter alia, resulted in a gross disparity between the value received by
Plaintiffs and the members of the Damages Class and the prices paid by them for
Interior Trim as set forth in N.M.S.A. § 57-12-2E, due to the inflated prices paid by
Plaintiffs and Class members for Vehicles and Interior Trim.

(d)     Defendants' unlawful conduct had the following effects: (1) Interior Trim
price competition was restrained, suppressed, and eliminated throughout New
Mexico; (2) Interior Trim prices were raised, fixed, maintained, and stabilized at
artificially high levels throughout New Mexico; (3) Plaintiffs and the members of
the Damages Class were deprived of free and open competition; and (4) Plaintiffs
and the members of the Damages Class paid supracompetitive, artificially inflated
prices for Interior Trim and Vehicles containing Interior Trim.

(e)     During the Class Period, Defendants' illegal conduct substantially affected
New Mexico commerce and consumers.

FILED UNDER SEAL

(f)     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

222.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*.

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Interior Trim were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Interior Trim they had purchased inside Vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were ultimately borne by automobile dealers.

(c)     The conduct of the Defendants described herein constitutes consumer oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

FILED UNDER SEAL

(d)     Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Interior Trim were misled to believe that they were paying a fair price for Interior Trim or the price increases for Interior Trim were for valid business reasons; and similarly situated purchasers were potentially affected by Defendants' conspiracy.

(e)     Defendants' unlawful conduct had the following effects:  (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout New York; (2) Interior Trim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of Vehicles or Interior Trim in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of Vehicles and Interior Trim in New York, paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim, and were subjected to Defendants' deceptive practices.

(f)     Defendants knew that their unlawful trade practices with respect to pricing Interior Trim would have an impact on all purchasers in New York and not just the Defendants' direct customers.

(g)     Defendants knew that their unlawful trade practices with respect to pricing Interior Trim would have a broad impact, causing class members who indirectly purchased Interior Trim to be injured by paying more for Interior Trim than they would have paid in the absence of Defendants' unlawful trade acts and practices.

FILED UNDER SEAL

(h)     During the Class Period, Defendants marketed, sold, or distributed Interior Trim in New York, and Defendants' illegal conduct substantially affected New York commerce and New York purchasers.

(i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Interior Trim in New York.

(j)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

223.   The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Interior Trim were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants' unlawful conduct had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Interior Trim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Interior Trim or Vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased

FILED UNDER SEAL

Interior Trim or Vehicles in North Carolina, paid supracompetitive, artificially inflated prices for Interior Trim and Vehicles containing Interior Trim, including in North Carolina.

(c)     During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of Interior Trim and Vehicles.

(d)     Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy.   Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Moreover, Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

(e)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, marketed, sold and/or distributed Interior Trim in North Carolina.

(f)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

224. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*[1]

(a) Defendants' combinations or conspiracies had the following effects: (1) Interior Trim price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Interior Trim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Trim.

(b) During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

### FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Class)**

225. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

---

[1] Included for appellate purposes.

FILED UNDER SEAL

226.    Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*, with the exception of California, but including South Carolina.  Plaintiffs also bring this claim under the laws of Missouri, Massachusetts, and Illinois.

227.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Interior Trim.

228.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Interior Trim.

229.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

230.    Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased Vehicles containing Interior Trim subject to Defendants' conspiracy would have been futile.

**<u>PRAYER FOR RELIEF</u>**

Accordingly, Plaintiffs respectfully request that:

231.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

FILED UNDER SEAL

232.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

(b)    A *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

(c)    An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)    Acts of unjust enrichment by Defendants as set forth herein.

233.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

234.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

235.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

FILED UNDER SEAL

236. Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

237. Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

238. Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

239. Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure 38(b), of all issues so triable.

Date: September 12, 2018

MANTESE HONIGMAN, P.C.
 */s/ Gerard V. Mantese*
Gerard V. Mantese
(Michigan Bar No. P34424)
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com

***Interim Liaison Counsel for Dealership Plaintiffs***

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Yifei Li
**CUNEO GILBERT & LaDUCA, LLP**
Suite 200
4725 Wisconsin Avenue, NW

**FILED UNDER SEAL**

Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com

Don Barrett
David McMullan
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone:  (662) 834-2488
Facsimile:  (662)834-2628
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Shawn M. Raiter
**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone:  (651) 312-6500
Facsimile:  (651) 312-6618
sraiter@larsonking.com

*Interim Co-Lead Class Counsel for*
*Dealership Plaintiffs*